## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**MARIETTA HEALTH CARE
PHYSICIANS, INC.,**

                             **:**

        **Plaintiff,**

**v.**

                            **Case No. 2:19-cv-5626**
                            **Judge Sarah D. Morrison**
                            **Magistrate Judge Kimberly A.
Jolson**

**MATTHEW YOAK, M.D.,**        **:**

        **Defendant.**

### OPINION AND ORDER

This contract dispute between an Ohio Professional Corporation that operates and maintains a hospital in Washington County and one of its former employees is before the Court on cross motions for summary judgment. Plaintiff Marietta Health Care Physicians, Inc. ("MHCP") has moved for summary judgment in its favor on all claims (ECF No. 40), while Defendant Matthew Yoak, M.D. has moved for partial summary judgment (ECF No. 43). The Court held oral argument on the motions on January 12, 2021.[1] Both motions are ripe for decision.

## I.    STATEMENT OF FACTS

Dr. Yoak is a plastic and reconstructive surgeon who was first employed by MHCP in 2005. (Yoak Dep., ECF No. 42-2, PageID 849.) From March 2013, through February 2019, his employment was governed by an Employment Agreement, to

---

[1]All citations to the transcript of this hearing are to the "rough" transcript prepared for the Court's use in rending this Opinion and Order.

1

which the parties added two Addenda. (Agreement, ECF Nos. 43-1–43-3.) All three

instruments were drafted by MHCP. (Yoak Decl., ECF No. 43-4, ¶ 5.)

Pursuant to the Agreement, Dr. Yoak agreed to provide full-time plastic and

reconstructive surgery services at Marietta Memorial Hospital ("MMH"), in

exchange for compensation determined as follows:

> (a) Compensation. During the time of this Agreement, subject to
> Section 3(a)(1) below, the Corporation [(MHCP)] shall pay Physician
> [(Dr. Yoak)], in twenty-six (26) bi-weekly installments, compensation
> consisting of $896,943 with adjustments to compensation occurring
> biannually based upon the following formula:
>
>> (1) Work Based Relative Value Units. Physician's total
>> professional worked Relative Value Units (wRVU's) shall be
>> based upon wRVU data as established by MGMA-All, for
>> physicians practicing Plastic and Reconstructive Surgery.
>>
>>> (i) Performance Review. On a biannual basis (April-
>>> September & October-March), Physician's total wRVU's
>>> will be calculated and Physician shall receive a positive or
>>> negative compensation adjustment based upon each
>>> wRVU Physician produces above or below 9379.31 during
>>> the relevant review period. The dollar figure for each
>>> wRVU shall be based upon the seventy-fifth percentile
>>> (75%) compensation per wRVU as established by MGMA-
>>> All for Plastic and Reconstructive Surgery.
>>>
>>> (ii) Covered Services. Physician's wRVU Compensation
>>> will not include wRVU's arising from services of nurse
>>> practitioners ("NP's") and physician assistants ("PA's")
>>> supervised by Physician and will not include the technical
>>> component of any service.
>>
>> (2) Product Sales. Physician shall receive on an annual basis
>> forty percent (40%) of net revenue generated through Product
>> Sales of items sold through the Physician's practice.

(Agreement, § 3(a).) Dr. Yoak was also provided paid leave benefits:

> (b) Paid Leave. In addition to the foregoing compensation, to be paid

under this Agreement, the Corporation shall provide paid time off ("PTO") for vacation, sick leave and Continuing Medical Education. Physician shall receive a total of six (6) weeks (30 business days) of leave for vacation, sick and continuing education. Such leave shall not accrue and carry-over from year-to-year. The Corporation shall reimburse Physician up to a maximum aggregate amount of $5,000 annually for all expenses reasonably incurred by Physician with respect to continuing medical education activities attended by Physician on behalf of the Corporation. Holidays are established by the Corporation.

> (1) PTO is not cumulative from year to year and unused PTO will not be paid at the end of the fiscal year, or at termination of this Agreement,
>
> (2) PTO will be prorated based on the hire date and the Corporation fiscal year that runs October through September. The maximum PTO amount will be replenished within the Corporation's payroll system in the first pay period of October for tracking purposes.
>
> (3) After notice of termination of this Agreement has been given, any unused PTO may only be taken with the prior consent of the Corporation.
>
> (4) Should Physician use all available PTO and require additional time off due to extended illness, Physician will be subject to individual Short-Term or Long-Term Disability Plans in effect at the time of illness.

(*Id.*, § 3(b).)

The Agreement further provides:

This Agreement may at any time be amended in whole or in part by written instrument executed by each party. . . . No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

(*Id.*, § 10.)

The Agreement had a one-year term that was automatically renewed for

3

additional one-year periods. (*Id.*, § 5.) However, the parties could otherwise terminate for cause, for breach, and without cause. (*Id.*, § 5(a).) To terminate without cause, the Agreement required "ninety (90) days written notice to the other party." (*Id.*, § 5(a)(4).)

The parties also entered into two addenda to the Agreement. Pursuant to the First Addendum, Dr. Yoak agreed to serve as Medical Director for the Center for Wound Healing, for which MHCP would pay $155 per hour for services rendered. (Agreement, First Adden.) As Medical Director, Dr. Yoak reviewed "the medical cases dealing with any difficult medical issues patients might be having, answer[ed] various questions from the nursing director, the program director or other physicians, and review[ed] cases." (Yoak Dep., PageID 851.) The Second Addendum called for Dr. Yoak to provide additional professional services (including community service and trauma call coverage as those services pertain to plastic surgery), for which MHCP agreed to pay him $50,000 per year. (Agreement, Sec. Adden. *See also* Yoak Dep., PageID 851–52.)

### A. Dr. Yoak's Compensation Under the Agreement

The dispute now before the Court centers on the compensation payable under Section 3 of the Agreement—including the compensation payable on wRVUs, on product sales, and for paid leave.

#### 1. Productivity-Based Compensation

Both parties agree that calculating Dr. Yoak's productivity-based compensation was a manual and complex process. The starting point was a base of

$896,943. (Agreement, § 3(a).) The base was then adjusted biannually, pursuant to a formula based on Dr. Yoak's production units (the wRVUs). (*Id.*)

According to the Agreement, on a biannual basis,[2] Dr. Yoak would receive a positive or negative adjustment to his salary "based upon each wRVU . . . produce[d] above or below 9379.31 during the relevant review period."[3] (Agreement, § 3(a)(1).) The dollar compensation per wRVU was "based upon the seventy-fifth percentile (75%) compensation per wRVU as established by MGMA-All for Plastic and Reconstructive Surgery." (*Id.*). For most medical procedures, wRVUs are assigned by Medicare. (Lines Dep., ECF No. 42-1, PageID 811–12.) However, because Medicare does not pay for cosmetic procedures, it does not assign wRVUs for many of the services provide by Dr. Yoak. As a result, MHCP used the Medicare wRVUs for Dr. Yoak's non-cosmetic procedures but created its own for the cosmetic procedures. (*Id.*)

Until Fall 2017, Karen Lines[4] handled the biannual adjustments for all

---

[2] The biannual adjustments were based on Dr. Yoak's total wRVUs in the months of October through March, and April through September. (Agreement, § 3(a)(1).) This schedule tied to MHCP's Fiscal Year, which runs from October 1st to September 30th. (Lines Dep., ECF No. 42-1, PageID 805.)

[3] Although the reviews occurred biannually, the 9379.31 wRVU baseline was an annualized figure.

[4] Karen Lines worked for MMH, a different entity than MHCP. (Lines Dep., PageID 803.) Nevertheless, the parties agree that, on behalf of MHCP, Ms. Lines was in charge of implementing all physician contracts and making all wRVU-compensation calculations, including for Dr. Yoak. (Hr'g. Tr., 4–5.) She held several titles during the term of Dr. Yoak's Agreement. She was a Finance Analyst before she became the Director of Finance for Physicians. (Lines Dep., PageID 804.) In May 2015, she became the Director of Business and Operations for Physician Clinics, which position she held until January 2018. (*Id.*, PageID 804–05.)

MHCP physicians, including Dr. Yoak. She followed the same basic process for approximately 200 physicians. (*Id.*, PageID 811–12.) First, Ms. Lines (or a member of her team) ran a report from MMH's accounting system showing a physician's wRVUs.[5] (*Id.*, PageID 804.) That report was then used to prepare a spreadsheet calculating a physician's compensation. (*Id.*) Ms. Lines testified in deposition that this calculation "was a very manual process." (*Id.*) Once the calculation was complete, the file was sent to the Finance Department for review before being sent to Eric Young (MMH's Chief Financial Officer) for review and approval. (*Id.*, PageID 809.) After the calculations were approved by both the Finance Department and the CFO, Ms. Lines met with each physician to go over the information, including any necessary adjustments to compensation. (*Id.*, PageID 804–05.) "Once everyone had reviewed and approved [the spreadsheet calculations]," the information was sent to the Human Resources Department, which made any necessary payroll changes. (*Id.*, PageID 809.)

As Luke Smith (a vice-president at MHCP) recognized, the purpose of the biannual meetings was so "a physician is seeing their wRVUs and . . . that is their opportunity to dispute. If there's no dispute, then they're accepting the work RVUs that have been portrayed to them and thus we make, you know, calculations for compensation adjustments." (Smith Dep., ECF No. 42-3, PageID 901.) The biannual compensation review process also afforded MHCP the opportunity to reconcile any

---

[5] A physician's billing office reported wRVUs in the first instance. Those reports were then put into the MMH system. (Lines Dep., PageID 804.)

overpayments or underpayments in physician compensation. (Lines Dep., PageID 810.) In the event of an underpayment, a physician typically took that compensation as a bonus, as opposed to an increase in base salary. (*Id.*) In the event of an overpayment, the physician's base compensation would be reduced for the next six months. (*Id.*) When a physician's base compensation was adjusted, Ms. Lines noted that on her spreadsheet as a new hourly rate, which was then sent to the CFO. (*Id.*, PageID 813.)

Ms. Lines acknowledged that Dr. Yoak's calculations were "unique" because of the specialty cosmetic procedures for which she also had to do a manual wRVU calculation. (*Id.*, PageID 811–12.) However, consistent with her typical practice, Ms. Lines met with Dr. Yoak biannually until Spring 2017 to review his performance and to implement any necessary compensation adjustments. (*Id.*, PageID 806.) Ms. Lines discontinued her practice in the Fall of 2017, at the instruction of management. (Smith Dep., PageID 917; Yoak Dep., PageID 856; Lines Dep., PageID 806, 828.) The change occurred as a result of a restructuring of MHCP's corporate leadership structure. (Smith Dep., PageID 899.) As part of that restructuring, Mr. Smith stepped into a new role as a vice president and took on oversight of physician compensation. (*Id.*, PageID 899.) MHCP decided it needed to get "all [physician] agreements under kind of one uniform methodology . . . [it] wanted to move everyone to kind of one uniform production model." (*Id.*, PageID 900.)

MHCP now states that, in the Fall of 2017, it determined that Dr. Yoak had been overpaid under the Agreement. Mr. Smith testified that he "had a

conversation with" Dr. Yoak around that time to inform Dr. Yoak that, while he didn't have all of the information yet, he "was seeing overpayments [to Dr. Yoak]." (*Id.*, PageID 908). However, no changes were made to Dr. Yoak's compensation in Fall 2017. (*See* Yoak Decl., ¶¶ 13–17.)

By early 2018, MHCP wanted to come up with a new employment agreement for Dr. Yoak and to "settle the overpayments." (Smith Dep., PageID 908.) The parties met in March 2018 to discuss these issues. (*Id.*) Dr. Yoak characterizes the meeting as an "interrogat[ion] about the different components of [his] compensation." (Yoak Decl., ¶ 17.) Perhaps unsurprisingly, the parties were unable to come to any resolution at this meeting. (*Id.*) Nor did MHCP adjust Dr. Yoak's compensation at that time. (*Id.*)

Dr. Yoak then retained counsel, and the parties met in  November 2018 to discuss the alleged overpayment to Dr. Yoak and other compensation issues. (*Id.*, ¶ 19.) That meeting was also unsuccessful in resolving the matter. Nevertheless, MHCP then reduced Dr. Yoak's compensation by more than $40,000. (*Id.*, ¶ 23.) MHCP advised Dr. Yoak that the adjustment was to address a wRVU deficit in Fiscal Year 2018. (*See* Nov. 9, 2018 Email, ECF No. 43-6; Nov. 27, 2018 Letter, ECF 43-7.)

Then, in February 2019, MHCP further reduced Dr. Yoak's base compensation by $75,000 annually. (Yoak Decl., ¶ 25.) Dr. Yoak learned about the February 2019 pay cut when he received his bi-weekly paycheck on February 22, 2019. (*Id.*) He resigned that day. (*Id.*, ¶ 26.)

### 2. Product Sales-Based Compensation

The second component of Dr. Yoak's compensation under the Agreement further provides that Dr. Yoak is to be annually paid 40% of net revenue generated through Product Sales of items sold through his practice. (Agreement, § 3(a)(2).) Dr. Yoak alleges that he was not paid for certain cosmetic Product Sales commissions earned. (Yoak Decl., ¶ 29.)

### B. MHCP terminates the Addenda

On November 9, 2018, Luke Smith verbally told Dr. Yoak that his Medical Directorship with the Center for Wound Healing (*i.e.*, the work under the First Addendum) was terminated effective immediately. (Yoak Decl., ¶ 21.) MHCP then sent an e-mail to Dr. Yoak and Dr. Yoak's attorney terminating both Addenda. (Nov. 9, 2018 Email.) While Dr. Yoak maintains that he did not see that email until January 2019, there is no evidence that he continued to perform services under either Addendum after the date on which the email was sent. (*See* Yoak Decl., ¶ 27.).

### C. Procedural Background

MHCP filed this action in December 2019 in state court, alleging that Dr. Yoak had been over-compensated and seeking to recover that overpayment. MHCP asserts claims for unjust enrichment and breach of contract. (ECF No. 4.)

Dr. Yoak removed the case to this Court based on diversity jurisdiction. (*See* ECF No. 1.) He then brought Counterclaims for Breach of Employment Agreement,

Breach of the First Addendum, Breach of the Second Addendum, Unjust

Enrichment, and Declaratory Judgment, Accord and Satisfaction. (ECF No. 5.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine

issues of material fact, which may be achieved by demonstrating the nonmoving

party lacks evidence to support an essential element of its claim. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*,

12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving

party to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P.

56). When evaluating a motion for summary judgment, the evidence must be viewed

in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant

probative evidence" to show that "there is [more than] some metaphysical doubt as

to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.

1993). In other words, "the evidence is such that a reasonable jury could return a

verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that

summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.   ANALYSIS

### A.   Claims for Unjust Enrichment

Dr. Yoak argues that he is entitled to summary judgment on MHCP's unjust enrichment claim, because the existence of the Agreement precludes that claim. The Court agrees.

Under Ohio law,[6] "[u]njust enrichment operates in the absence of an express contract to prevent a party from retaining money or benefits that in justice and equity belong to another." *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 646 (N.D. Ohio 2012) (internal quotation and citation omitted) (original alterations omitted). The cause of action arises out of a "quasi-contract implied by the court." *Bush Truck Leasing, Inc. v. Cummins, Inc.*, No. 1:18-cv-871, 2020 WL 3871322, at *8 (S.D. Ohio July 9, 2020) (McFarland, J.) (internal quotation and citation omitted). But "Ohio law does not allow parties to seek damages under quasi-contractual theories of recovery . . . when a contract governs the relationship." *Id.* (internal quotations and citations omitted). In other words, "a plaintiff may not

---

[6] This case is before the Court on diversity jurisdiction. *See* 28 U.S.C. § 1332. "[F]ederal courts sitting in diversity apply the substantive law of the forum state and federal procedural law." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing, *inter alia*, *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1939)). The Agreement provides that it will be governed by Ohio law. (Agreement, § 10.) Without specific reference to the Agreement, both parties apply Ohio law in their motion papers. Accordingly, the Court will apply Ohio substantive law in its analysis.

recover under the theory of unjust enrichment when an express contract covers the same subject." *Bihn v. Fifth Third Mortg. Co.*, 980 F. Supp. 2d 892, 904 (S.D. Ohio 2013) (Rose, J.).

MHCP argues that unjust enrichment is the proper mechanism to recover an overpayment of wages by an employer to an employee, citing *Cutcliffe v. Wright State Univ.*, No. 3:17-cv-222, 2019 WL 316909 (S.D. Ohio 2019) (Rose, J.). However, *Cutcliffe* is inapplicable to the instant case; that holding applies only where the alleged unjust enrichment falls outside the scope of the contract. *See, e.g.,* Restatement (Third) of Restitution & Unjust Enrichment § 2(2) (2011) ("A valid contract defines the obligations of the parties *as to matters within its scope*, displacing to that extent any inquiry into unjust enrichment." (emphasis added)). Here, the dispute for which MHCP seeks damages is whether Dr. Yoak was paid appropriately **under the Agreement**. MHCP alleges that, **pursuant to the terms of the Agreement**, Dr. Yoak was overpaid $562,300.20 — it does not dispute the existence or validity of the Agreement. MHCP's claim for unjust enrichment is barred and Dr. Yoak's motion for summary judgment as to that claim is **GRANTED**.

At oral argument, Dr. Yoak's counsel acknowledged that this analysis applies with equal force to his counterclaim for unjust enrichment. (Hr'g Tr., 24.) Accordingly, Dr. Yoak's counterclaim for unjust enrichment is barred and is hereby **DISMISSED**.

**B.      Claims for Breach of the Base Agreement**

The parties each allege that the other breached the Agreement. For its part, MHCP alleges that Dr. Yoak breached the Agreement by accepting overpayments in the amount of $562,300.20 and by failing to pay back that amount; it seeks summary judgment on this claim. In response, Dr. Yoak argues summary judgment on MHCP's claim is inappropriate but seeks summary judgment on his counterclaim alleging that MHCP breached the Agreement by failing to make biannual adjustments to his compensation after Spring 2017, and by failing to pay him all amounts due under the paid leave and product sales-based compensation provisions of the Agreement.[7]

Contract interpretation is ordinarily a matter of law for determination by the court. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995). "The court's role in interpreting a contract is to 'give effect to the intent of the parties.'" *Fujitec Am., Inc. v. AXIS Surplus Ins. Co.*, 458 F. Supp. 3d 736, 743 (S.D. Ohio 2020) (Litkovitz, M.J.) (quoting *Goodyear Tire & Rubber Co. v. Lockheed Martin Corp.*, 622 F. App'x 494, 497 (6th Cir. 2015)). To give such effect, "[c]ontract terms are generally to be given their ordinary meaning when the terms are clear on their face," and courts must "apply the plain language of the contract when the intent of the parties is evident from the clear and unambiguous language in a provision." *CoMa Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir.

---

[7] Dr. Yoak's counterclaims alleging breach of the two Addenda are discussed in § III.C.

2013). *See also Foster Wheeler Envirespanse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997).

"Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996). For example, the court may use the parties' course of performance to determine their intent. *See St. Marys v. Auglaize Cty. Bd. of Comm'rs*, 875 N.E.2d 561, 568 (Ohio 2007); *see also* Restatement (Second) of Contracts § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

## 1. Dr. Yoak's Productivity-Based Compensation

The competing motions for summary judgment tee up two issues with regard to Dr. Yoak's productivity compensation. First, was he overpaid under the Agreement, and second, what was the impact of MHCP's failure to make biannual adjustments to Dr. Yoak's compensation in Fall 2017 and Spring 2018. Left unaddressed by these two issues is Dr. Yoak's productivity compensation as adjusted in Fall 2018 through the end of his Agreement. The Court begins its analysis with the Agreement.

### a.      Prior to Fall 2017

The parties agree that the Agreement is unambiguous, though they encourage different interpretations of that Agreement. The Court finds that the Agreement is unambiguous with regard to the wRVU portion of his compensation. *See, e.g., Equitable Life Assur. Soc'y of U.S. v. Poe*, 143 F.3d 1013, 1016 ("Mere disagreement among parties as to the meaning of [contract] terms does not constitute ambiguity.").

Per the plain language of the Agreement, there are three key components to Dr. Yoak's productivity-based compensation.

*First*: Dr. Yoak's base salary of $896,943 was to be paid over 26 bi-weekly installments "with adjustments to compensation occurring biannually based on a formula." (Agreement, § 3(a).) Thus, $896,943 was the starting point—and any adjustments would be to that amount. At oral argument, Dr. Yoak's counsel argued that his base salary changed every six months as part of the true-up reconciliation. (Hr'g. Tr., 24). Nothing in the Agreement that supports that argument.

*Second*: Adjustments to Dr. Yoak's base salary were based on the goal of attaining 9,379.31 wRVUs per year. (Agreement, § 3(a)(1)(i).) If he produced above or below that amount, his compensation would be adjusted accordingly. Any wRVUs accrued in excess of 9,379.31 would result in additional compensation—but, if Dr. Yoak accrued less than 9,379.31 wRVUs, his base salary would be reduced. (*Id*.) The adjustment was calculated per wRVU, at a rate equal to the seventy-fifth percentile market benchmark. (*Id*.) Expressed numerically:

<u>Positive Adjustment</u>

> Yoak wRVUs = 9,379.31 + X

> Yoak Comp = $ 896,943.00 + (X * 75th percentile benchmark)

<u>Negative Adjustment</u>

> Yoak wRVUs = 9,379.31 − Y

> Yoak Comp = $ 896,943.00 − (Y * 75th percentile benchmark)

*Third*: Adjustments were to occur "[o]n a biannual basis." (*Id*.). There are no provisions in the Agreement allowing for adjustments at any other time.

The ambiguity appears in how MHCP performed under the Agreement for the first four years it was in place. As Ms. Lines testified, "that's not how these contracts were interpreted." (Lines Dep., PageID 830–31.) Rather, to account for the fact that the compensation per wRVU changes every year, the base salary and wRVU goals identified in the Agreement were "disregarded" and Dr. Yoak was simply paid at the 75th percentile of the then-current wRVU value for <u>all</u> wRVUs that he generated. (*Id*.) Expressed numerically, MHCP calculated his compensation as follows:

> Yoak wRVUs = 9,379.31 + X

> Yoak Comp = (9,379.31 + X) * 75th percentile benchmark

Despite finding that the Agreement, as written, is unambiguous, the Court nonetheless finds it unenforceable, as written. Instead, the record evidence makes clear that the Agreement was modified by the parties' course of conduct over the first four years of performance thereunder.

In its Motion for Summary Judgment, MHCP characterizes this as "a mistake in calculations by Ms. Lines." (ECF No. 40, PageID 565.) But her calculations were no mistake. Rather, Ms. Lines testified that MHCP "disregarded" the contractual baseline for Dr. Yoak and for other physicians as well. (Lines Dep., PageID 830–31.) "Otherwise, [Dr. Yoak was] not being paid at the 75th percentile." (*Id.*) Ms. Lines' calculations were approved by both the Finance Department and the CFO. (*Id.*, PageID 809, 821.) And it was only when new management came to MHCP—years into the parties' performance under the Agreement—that it sought to enforce the Agreement as written.

As discussed above, under Ohio law, the parties' course of performance may be used as evidence of intent when a contract contains ambiguous terms. But the "practical construction made by the parties may [also] be considered by the court as an aid to its construction . . . *when a dispute has arisen between the parties after a period of operation under the contract*." *St. Marys*, 875 N.E.2d at 569 (quoting *Consol. Mgt., Inc. v. Handee Marts, Inc.*, 671 N.E.2d 1304, (Ohio Ct. App. 1996)) (emphasis in original). *See also Nat'l City Bank of Cleveland v. Citizens Bldg. Co. of Cleveland*, 74 N.E.2d 273, 279 (Ohio Ct. App. 1947) ("Where a dispute arises relating to an agreement under which the parties have been operating for some considerable period of time, the conduct of the parties may be examined in order to determine the construction which they themselves have placed upon the contract, and great weight will be given to such construction.") Even where, as here, an agreement requires all modifications to be in writing, "an oral modification of a

written contract can be enforceable notwithstanding [such] a provision . . . where . . . the parties have engaged in a course of conduct in conformance with the oral modification and where the party seeking to enforce the oral modification would suffer injury if the modification were deemed invalid." *Exact Software N. Am., Inc. v. Infocon Sys., Inc.*, No. 3:03-cv-7183, 2004 WL 952876, at *5 (N.D. Ohio Apr. 16, 2004). *See also Barclay Petroleum, Inc. v. Bailey,* 96 N.E.3d 811, 820 (Ohio Ct. App. 2017).

In this case, based upon the parties' course of performance, it is clear that the Agreement was modified with regard to how Dr. Yoak's productivity-based compensation was calculated. This conclusion is confirmed by the fact that the Agreement had a built-in process to ensure that Dr. Yoak's productivity-based compensation calculations were made accurately and timely—the biannual adjustments. As even MHCP's new management recognizes, the biannual reviews are a "reconciliation process" and the physician's opportunity to dispute MHCP's calculations for any compensation adjustments—"[i]f there's no dispute, then [the physician is] accepting that work RVUs that have been portrayed to them and thus we make, you know, calculations for compensation adjustments." (Smith Dep., PageID 901, 911.) And, as Dr. Yoak's counsel pointed out at oral argument, if a dispute cannot be resolved as part of the reconciliation process, the unsatisfied party could then exercise the Agreement's termination provisions. If MHCP is permitted to make additional compensation adjustments **years** after services have been rendered, it would "erode[] Dr. Yoak's right of expectancy in the contract and

18

his right to be able to terminate the agreement in 90 days." (Hr'g. Tr., 26–27, referring to Agreement, §5(a).)

Accordingly, Dr. Yoak did not breach the Agreement by accepting compensation that MHCP now describes as an "overpayment" before Fall 2017. MHCP's motion for summary judgment on its breach of contract claim, as it pertains to the period before Fall 2017, is **DENIED**.

### b.    Fall 2017 and Spring 2018

Turning to Dr. Yoak's claim that MHCP breached the Agreement by failing to make biannual adjustments to his compensation after Spring 2017, he argues in his summary judgment motion that this failure precludes MHCP from seeking to enforce the Agreement now. (ECF No. 43, PageID 975.) In response, MHCP argues that any failure to adjust Dr. Yoak's compensation was not material.[8] (ECF No. 48 PageID 1102–07.)

"[A] 'material breach' of contract is a party's failure to perform an element of the contract that is 'so fundamental to the contract' that the single failure to 'perform defeats the essential purpose of the contract or makes it impossible for the other party to perform.'" *O'Brien v. Ohio State Univ.*, No. 06AP-946, 2007 WL 2729077, at *15 (Ohio Ct. App. Sept. 20, 2007) (quoting 23 Williston, *Contracts*, § 63:3 (4th Ed. 1990)). "The determination of whether a party's breach of a contract

---

[8] MHCP further argues that it did not adjust his productivity-based compensation because Dr. Yoak refused to cooperate. This argument is easily disposed of. Mr. Smith testified in deposition that Dr. Yoak had no ability to prevent MHCP from reducing his compensation. (Smith Dep., PageID 908.)

was a 'material breach' is generally a question of fact" because it "requires, *inter alia*, an examination of the parties' injuries, whether and how much the injured parties would or could have been compensated, and whether the parties acted in good faith." *Id.* (citation omitted). However, when the underlying facts are not disputed, "[t]he question of materiality need not be left to the trier of fact and may be decided on summary judgment . . . as a matter of law." *U.S. for the Use and Benefit of Ken's Carpets Unltd., Inc. v. Interstate Landscaping Co., Inc.*, 37 F.3d 1500, 1994 WL 481684, at *7 (6th Cir. 1994).

As already discussed, the biannual adjustment was required by the Agreement: "[o]n a biannual basis" Dr. Yoak's wRVUs "**will** be calculated" and then Dr. Yoak "**shall** receive a positive or negative compensation adjustment." (Agreement, §3(a) (emphasis added).) But MHCP did not make any adjustments for the time periods of April through September 2017 and October 2017 through March 2018.

Nevertheless, the Court cannot conclude, as a matter of law, that MHCP's failure to perform the biannual adjustment calculations, or make such adjustments, in Fall 2017 and Spring 2018 to Dr. Yoak's productivity-based compensation was a material breach of the Agreement. Dr. Yoak has provided no evidence by which a jury could find that he was actually injured by MHCP's failure to make these two biannual adjustments. While Dr. Yoak makes passing reference in his Motion to "open questions that affect [his] Counterclaim damages regarding whether Plaintiff properly calculated Dr. Yoak's compensation from the second half of Fiscal Year

2017 (*i.e.*, April 2017) forward," (ECF No. 43, PageID 977), he does not offer any evidentiary basis upon which a jury could find that he would or should have been compensated differently if the process set out in the Agreement had been followed to the letter—*i.e.*, that he was damaged by MHCP's failure to act.

As to MHCP's claims that Dr. Yoak was *over*compensated in Fall 2017 and Spring 2018, the Court similarly finds that there is no genuine dispute of material fact. The Agreement unambiguously provides for a biannual adjustment—without opportunities for true-up at any other time. MHCP itself recognized the need for the biannual reconciliation adjustments to occur as scheduled. MHCP is bound by its decision not to adjust Dr. Yoak's compensation in Fall 2017 and Spring 2018. In other words, MHCP did not breach the Agreement by failing to make biannual adjustments to Dr. Yoak's compensation in Fall 2017 and Spring 2018—but it is bound by the compensation paid to him without adjustment and cannot now claim that Dr. Yoak was overpaid during that time period.

MHCP's motion for summary judgment on its breach of contract claim, as it pertains to Fall 2017 through Spring 2018, is **DENIED.** Dr. Yoak's motion for summary judgment on this portion of his breach of contract claim is also **DENIED**.

### c.    Fall 2018 and Spring 2019

MHCP reduced Dr. Yoak's productivity-based compensation in November 2018 and again in February 2019. The evidence before the Court reflects that Dr. Yoak disagreed with the wRVU calculations upon which those reductions were based. Nonetheless, the only evidence bearing on the appropriate amount of Dr.

Yoak's productivity-based compensation for that time period is MHCP's argument using a formula that this Court has already concluded does not apply, in light of the parties' course of performance. (*See* ECF No. 40, PageID 544–46.) Accordingly, there is a genuine issue of material fact regarding whether Dr. Yoak was overcompensated in November 2018 through the termination of his employment with MHCP.

MHCP's motion for summary judgment on its breach of contract claim, as it pertains to Fall 2017 through Spring 2018, is **DENIED**.

### 2.    Dr. Yoak's Paid Leave Benefits

Dr. Yoak next alleges that he is entitled to paid leave under the Agreement. MHCP seeks summary judgment on this issue, arguing that Dr. Yoak is not entitled to additional compensation for paid leave. (ECF No. 40, PageID 548.)

Section 3(b) of the Agreement providing for "paid leave" is less than clear and, by its plain language, implies that the contemplated paid leave is "[i]n addition to the [productivity-based compensation and product sales-based compensation]." (Agreement, § 3(b).) But the Court need not delve into whether Dr. Yoak was entitled to received additional paid leave benefits during the term of his Agreement because the Agreement unambiguously provides that "PTO is not cumulative from year to year and **unused PTO will not be paid at the end of the fiscal year, or at termination of this Agreement**." (*Id*., § 3(b)(1) (emphasis added).) Thus, regardless of what Dr. Yoak may have been entitled to during the term of the Agreement, it is clear that he was not entitled to a payout of any paid leave after

termination of the Agreement.

MHCP's motion for summary judgment on Dr. Yoak's claim for paid leave is **GRANTED**.

### 3. Dr. Yoak's Product Sales-Based Compensation

Finally, with regard to the alleged breaches of the compensation provisions of the base Agreement, Dr. Yoak alleges that MHCP failed to pay him the required percentage of cosmetic product sales from November 2018 through his separation in February 2019 and for breast implants that were sold in Fiscal Year 2018. MHCP admits that it withheld certain product sales commissions but argues that those monies were properly applied as offsets against the amount owed by Dr. Yoak to MHCP. (*See* ECF No. 48, PageID 1108–09.) MHCP further admits that it stopped paying Dr. Yoak a commission on breast implants but argues that it was not required to do so for medical devices used in surgery. (*Id.*, PageID 1118.)

The Agreement provides that Dr. Yoak will receive a percentage of "net revenue generated through Product Sales of items sold through the Physician's practice." (Agreement, § 3(a)(2).) Despite being capitalized, "Product Sales" is not defined in the Agreement. MHCP argues that this language provided Dr. Yoak with a commission only on certain retail products, and not on breast implants used in augmentation surgeries. (ECF No. 48, PageID 1118.) However, MHCP's limitation to "retail products" does not appear in the Agreement and runs counter to the fact that MHCP paid a commission to Dr. Yoak on breast implants for at least the first four years that the Agreement was in place. (*Id.*; Hr'g. Tr., 29.) Thus, based upon

the parties' course of performance, the parties intended that "Product Sales" include the sale of breast implants.

Neither party submitted evidence of the amount of breast implant commissions withheld by MHCP. For the non-breast implant commissions, MHCP says that it withheld $5,250.80. (Warden 3d Aff., ECF No. 48-2, ¶ 5.) Dr. Yoak has no reason to dispute that amount. (Hr'g. Tr., 29.)

MHCP's motion for summary judgment as to Dr. Yoak's product sales-based compensation is **DENIED**. Dr. Yoak's motion for summary judgment on that issue is **GRANTED**.

### C.    Claims for Breach of the Addenda

Dr. Yoak's claims for breach of the First and Second Addenda to the Agreement are the same—he alleges that MHCP breached the Addenda by failing to give 90 days' written notice before termination.

"[A]n addendum to a contract does not create a new contract, it merely modifies the original." *Kaufman v. Byers*, 823 N.E.2d 530, 536 (Ohio Ct. App. 2002) (internal quotation and citation omitted). Here, the two addenda have identical language with reference to the Agreement:

> Addendum to the Employment Agreement Dated March 1st, 2013, (the "Agreement"), between Marietta Health Care Physicians, Inc. ("Corporation") and Matthew Yoak, M.D. ("Physician")
>
> Notwithstanding any provision in the Agreement, this Addendum shall set forth exclusively the agreement between the parties relative to the subject matter of this Addendum. In the event of a conflict between the Agreement and this Addendum, the provisions of this Addendum shall control.

(*Compare* Agreement, PageID 80 *to* PageID 83.) Each addendum then spells out the services it covers, but neither has a termination provision. Only the base Agreement addresses termination, and it provides as follows:

> At any time during the term of this Agreement, this Agreement may be terminated: . . . (4) <u>Without Cause</u>. Either party may terminate this Agreement for any reason or no reason, with or without cause, upon ninety (90) days written notice to the other party.

(Agreement, § 5(a).)

The language of the Agreement, as modified by the Addenda, is clear and unambiguous. Starting with the Addenda, each state that it sets forth "exclusively the agreement between the parties relative to the subject matter of this Addendum." (Agreement, PageID 80, 83.) Consequently, as to the extra services provided for therein, the only agreement for such services is the one spelled out in the respective Addendum. Lest there be any doubt as to the intent of the parties, both Addenda also make clear that, with regard to the services that are the subject of the Addendum, the provisions of the Addendum control. (*Id.*)

Moreover, looking at the Agreement itself, the 90-day termination provision upon which Dr. Yoak relies applies to "**this Agreement**." Although "this Agreement" ultimately included the Addenda thereto, there is no allegation that MHCP terminated the Agreement *in toto* by terminating the services provided under the Addenda. Rather, MHCP told Dr. Yoak in November 2018 that it was terminating his services under the Addenda.[9] Dr. Yoak was expected to—and did—

---

[9] As MHCP points out, Section 1(b) of the Agreement expressly contemplated that MHCP could reasonably assign Dr. Yoak's additional duties. (*See* Agreement

continue to perform the plastic and reconstructive surgery services discussed in the base Agreement until February 22, 2019.

Thus, MHCP did not breach the Addenda by terminating them without 90 days' notice. MHCP's motion for summary judgment on Dr. Yoak's claims for breach of the addenda is **GRANTED**. Dr. Yoak's motion for summary judgment on the same is **DENIED**.

### D.    Claim for Declaratory Judgment

The final issue on summary judgment is Dr. Yoak's claim for Declaratory Judgment, alleging that "a settlement occurred on or about November 1, 2018, which operates as a bar to MHCP's Complaint." (ECF No. 5, PageID 112–13.) MHCP seeks summary judgment on this claim on the grounds that there is no evidence to support this theory of relief. In response, Dr. Yoak does not address this claim or provide any evidence in support of the alleged accord and satisfaction.[10] When a party fails to respond or to otherwise oppose an issue raised by a defendant's summary judgment motion, the Court may deem the party to have waived opposition. *Humphrey v. U. S. Att'y Gen. Office*, 279 F. App'x 328, 331 (6th Cir. 2008) (citation omitted). *See also Coley v. State of Ohio Dep't of Rehab. & Corr.*, No. 2:16-cv-258, 2016 WL 5122559, at *1 (S.D. Ohio Sep. 21, 2016) (Kemp, M.J.).

---

§1(b).) Necessarily, this means that MHCP could reasonably un-assign such additional duties without terminating the Agreement as a whole.

[10]At oral argument, counsel for Dr. Yoak stated that this claim was "derivative of the negotiation that took place in November of 2018 that resulted in [MHCP] paying the product sales commission and then subsequently deciding that the prospective biannual adjustment was like the – the $40,000 reduction." (Hr'g. Tr., 30.)

Accordingly, MHCP's motion for summary judgment on Dr. Yoak's claim for declaratory judgment is **GRANTED**.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff Marietta Health Care Physicians, Inc.'s Motion for Summary Judgment (ECF No. 40) is **GRANTED in part and DENIED in part**, and Defendant Dr. Matthew Yoak's Motion for Partial Summary Judgment (ECF No. 43) is **GRANTED in part and DENIED in part.** Specifically, MHCP is **GRANTED** summary judgment on Dr. Yoak's: breach of contract claim as it pertains to paid leave benefits and for failure to make certain biannual adjustments; breach of contract claims based on termination of the addenda; and claim for declaratory judgment. Dr. Yoak is **GRANTED** summary judgment on MHCP's claim for unjust enrichment. He is also **GRANTED** summary judgment for his breach of contract claim as it pertains to product sales-based compensation.

Additionally, Dr. Yoak's claim for unjust enrichment is **DISMISSED**.

There are two issues remaining for trial: (1) whether Dr. Yoak was overcompensated for the time period of November 2018 through the termination of his employment and, if so, in what amount and (2) the amount of Dr. Yoak's damages resulting from withheld product sales-based compensation. A scheduling order will be issued shortly.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**